# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SUPERIOR DERRICK SERVICES, LLC.** | **\*CIVIL ACTION NO. 6:09-0484** |
| **VS.** | **\*MAGISTRATE JUDGE HILL** |
| **LONESTAR 203, ET AL.** | **\*BY CONSENT OF THE PARTIES** |

## MEMORANDUM RULING

The non-jury trial of this case before the undersigned Magistrate Judge commenced on November 8, 2011 and concluded on November 14, 2011.[1]  The parties were granted until December 12, 2011 to file Post-Trial Findings of Fact and Conclusions of Law.  Thereafter, the Court took this case under advisement.  This Ruling follows.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After due consideration of the facts and evidence which was presented by the parties at the trial of this matter through live witnesses and exhibits, including deposition excerpts, and having had the opportunity to assess the demeanor of the live witnesses, and review and weigh the evidence, this Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence.[2]

---

[1]All parties consented to the Court's jurisdiction being exercised by the undersigned pursuant to 28 U.S.C. § 636(c).

[2]To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

On April 19, 2006, Lonestar Drilling Nigeria, Ltd. ("Lonestar") and Superior Derrick Services, LLC ("Superior") entered into two separate but identical Barge Refurbishment Agreements ( "BRAs") with respect to the LONESTAR 203 and the LONESTAR 204 (collectively "the barges").   Exhibits A and B of the BRAs set forth defined scopes of work to be performed by Superior.  Exhibit G of the BRAs contains a Cost Summary which sets forth both firm costs and estimated costs, which at the time of contracting could not be firmly established.  The contract price for each BRA was $14,490,462.00. [P-1 and P-2].  Although the cost summary set forth in Exhibit G of each BRA totals $13,022,762.00, pursuant to paragraph 1.1 of the BRAs, the contract price of  $14,490,462.00 controls.

The BRAs provided for changes and modifications in the contractual work to be performed by Superior by written change order as follows:

> 4.1 The Owner [Lonestar] may at any time and from time to time direct changes in the contract work. Prior to directing any such changes, the Owner shall request the Contractor [Superior] to submit, and the Contractor shall submit to the Owner in writing, the Contractor's estimate of any increase or decrease in the Contract Price and any delay in the delivery of the Barge which would result from such changes. Such estimate shall be accompanied by a full description of any competent work which would be eliminated or would have to be modified, a full description of any acquired material which would not be used if the proposed changes were approved and the effect, if any, of the proposed changes upon any guarantee of the Contractor under the Contract. All of the contemplated requests for estimates and replies by Contractor shall be in the form of the Change Order attached hereto. Such Change Order shall only be effective if signed by the authorized representatives of both the Owner and Contractor.

4.2 After receipt of the Change Order referred to in Article 4.1, the Owner shall, via the Change Order, either notify the Contractor to proceed with the changes or advise the Contractor that the changes will not be made, in writing. If the Owner directs the Contractor to proceed with the changes, the Contract Price shall be increased or reduced as set forth in such estimate or as otherwise may have been agreed upon in writing by the parties.

4.3 The Contractor promptly shall proceed to perform any change in the contract work as agreed to in the change order as provided herein above.

Mr. Gardner testified that over one hundred written change orders were submitted by Superior to Lonestar under this contractual provision, and that those approved by Lonestar resulted in payments in excess of $9,700,000.00. [*See also* D-148; D-155, pg. 1051].

In April of 2007, Lonestar requested that Superior perform additional work under a separate time and materials arrangement.  This time and materials arrangement was agreed to verbally.  According to the testimony of Mr. Gardner, which on this point the Court accepts, under the verbal time and materials arrangement, Superior was to provide labor and materials to perform additional work as requested by Lonestar. There was an agreed hourly rate on the skilled labor including welders, electricians, mechanics and fitters that Superior provided, and the parties agreed to cost plus 15% on the materials that Superior was to provide.

By the beginning of November 2007, Lonestar owed Superior for work performed by Superior.  Accordingly, from December of 2007 to March of 2008, Lonestar and Superior engaged in additional negotiations.  These negotiations culminated in the March 2008 execution of a contract designated the "Turnkey Contract Agreement" ("The Agreement").

3

The contract price for the Agreement was $3,396,901.37. [P-3].  The full contract price was not paid upon execution of the Turnkey Agreement as required by the "due and payable" clause" of the final reconciliation of the Turnkey Agreement.  Rather, Lonestar made only a partial payment of $396,901.37, leaving the remaining $3,000,000.00 unpaid.

By October 2008, Lonestar again owed Superior for work performed by Superior. Accordingly, the parties again engaged in negotiations, because, as Mr. Aweto candidly testified, the parties were trying to avoid having to "go to court."  By letter dated October 2, 2008, Mr. Tannehill advised Mr. Aweto that $4,303,418.42 remained outstanding. [P 4].

While Lonestar contends that this letter precludes recovery of any claims pre-dating October 2, 2008, Mr. Aweto testified that he understood this amount to be an offer to settle all outstanding debts owed by Lonestar to Superior at that time.  This offer, however, was rejected by Chief Idisi, who controlled Lonestar.

Mr. Aweto's testimony is consistent with that of Mr. Tannehill given at the hearing on the motion to vacate the arrest of the barges and alternatively to fix security, found credible by this Court, that the amount set forth in the October 2, 2008 letter represented a "walk away" number offered by Superior to settle the amounts due at that time. [*See* rec. docs. 26 and 31]. Mr. Aweto further testified that by email of February 16, 2009 to Mr. Aweto, Mr. Tannehill further reduced Superior's offer to settle the financial dispute for $3,000,000.00, plus additional charges incurred after October 2, 2008, to avoid future litigation. [D-120]. Unfortunately, a compromise could not be reached between the parties.  The Court finds Mr.

4

Aweto's testimony on this point credible.

This Court has jurisdiction over the claims of Superior against Lonestar under its Admiralty and Maritime jurisdiction, 28 U.S.C. § 1333.  Superior's claims are brought pursuant to Admiralty Rule C, which allows an action *in rem* to be brought to enforce any maritime lien. Fed. R. Civ. P., Supp. Adm. Rule C(1)(a).  Venue is proper and uncontested.

The barges were arrested on March 27, 2009, and security in the form of a surety bond to secure the release of the barges was posted by Lonestar in the amount of $8,050,000.00. The arrest of the vessels was based on a maritime lien in favor of Superior for the work done on the barges.  A maritime lien is a special property right in a vessel, arising in favor of a creditor, by operation of law, as security for a debt or claim.  *Equilease Corporation v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir. 1986) (*en banc*).  A maritime lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be paid from the proceeds.  *Id*.  The Court's only jurisdiction in this case is *in rem*.  The Stipulation of Lonestar and its surety, International Fidelity Insurance Company, has been substituted for the barges. [rec. doc. 74].  Accordingly, for purposes of this Ruling, the term "Lonestar" includes the *in rem* liabilities of Lonestar Drilling Nigeria, Ltd., and its surety, International Fidelity Insurance Company.

On June 21, 2011, the Court entered Reasons for Ruling with respect to cross-motions for summary judgment addressing the proper interpretation of the "due and payable clause" of the final reconciliation of the Turnkey Agreement. [rec. doc. 158].  In so doing, the Court held

that Lonestar owed Superior $3,000,000.00 under the Turnkey Agreement and dismissed Lonestar's counter-claims for delay damages and penalties against Superior.  [*Id*.] Accordingly, for the reasons set forth in this Court's prior ruling, Superior is awarded the sum of $3,000,000.00 under the Turnkey agreement.

Superior's remaining claims were addressed at trial.  These claims have been grouped by Superior into four categories: Group A –  Claims under the Barge Refurbishment Agreements; Group B – Claims for post-Turnkey change orders; Group C – Claims under verbal contracts, implied contracts, and/or under *quantum meruit* or in equity; and Group D – Claims for living expenses for Lonestar personnel.  [P-43].

**Maritime Lien**

Superior has a maritime lien for the services, work, materials and supplies furnished to the barges.  The Federal Maritime Lien Act provides a maritime lien on a vessel to any "person providing necessaries to a vessel." 46 U.S.C. § 31342(a)(1).  It is well established that repairs to a vessel constitute a necessary for which the maritime law recognizes a lien.  46 U.S.C. § 31301(4)*; see also Boat La. Sambra v. Lewis,* 321 F.2d 29 (9th Cir. 1963); *Bradford Marine, Inc. v. M/V SEA FALCON,* 64 F.3d 585 (11th Cir. 1995).  "Necessaries" are defined to include "repairs, supplies, towage, and the use of dry dock or marine railway." 46 U.S.C. § 31301(4). "[C]ourts have given a broad construction to the term "necessaries" under the Lien Act in order to encourage suppliers to provide goods and services to vessels to keep them operating."  8 T. Russell, *Benedict on Admiralty* § 7.01[C] (rev. 7th ed. 2004) *citing e.g. The WESTERN WAVE*,

77 F.2d 695, 698 (5th Cir. 1935).

The test of whether a particular good or service is a "necessary" is based on the "apparent want of the vessel, not the character of the thing supplied, which makes it a necessary." *Equilease*, 793 F.2d at 603. "Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged . . . [t]hese 'things' may be money, labor and skill, and personal services as well as materials." *Id*. The term "includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Id*. However, to qualify, they must be "within the reasonable needs of the ship's business."  8 T. Russell, *Benedict on Admiralty*, § 7.01[C][1] (rev. 7th ed. 2004) *citing* e.g. *J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523 (5th Cir. 1959).

The evidence establishes that, with the exception of the provision of Lonestar employees' living and out of pocket expenses in the Group D claims, Superior's claims are for the provision of necessaries to the barges, at the direction of Lonestar, as owner and/or owner *pro hac vice* of the barges, or at the direction of agents or other persons with the authority to bind Lonestar.  From the evidence presented, the Court holds that Superior's prices for the work performed or the services rendered were reasonable.  *See* 46 U.S.C. § 31342.

**GROUP D CLAIMS**

For the reasons set forth in this Court's prior ruling [rec. doc. 31], Superior may not assert a maritime lien for sums it paid for Lonestar employees' living and out of pocket

7

expenses as claimed in Group D.  These sums include amounts for Lonestar employees' cell phones, lodging at hotels, meals, plane tickets to fly to and from the New Iberia work site and petty cash to pay for incidental expenses connected with their operation.

As this Court previously held, neither Superior nor the Court was able to locate a single case holding that a party contracted to repair or refurbish a vessel may assert a maritime lien against the vessel owner to pay living or out of pocket expenses of the vessel owner's employees who happen to be on site where the repairs and refurbishment are taking place, particularly when there is no evidence that those employees were actively engaged in the repair or refurbishment operations.

While Mr. Tannehill testified at the hearing on the motion to vacate the arrest of the barges and alternatively to fix security that these Lonestar employees were "on site working on the project", he failed to provide the Court with any details of how they were engaged in the repair or refurbishment operation, which was to be contractually performed by Superior and its employees, or sufficient facts to enable this Court to find their on site work was reasonably needed for the ship's repair and refurbishment.

The evidence adduced at trial likewise provides insufficient support for Superior's *in rem* claim for these expenses.  While Lonestar employees were "on site" at the New Iberia Superior facility, they were not engaged in the repair or refurbishment operation, nor was their presence on site reasonably needed for the ship's repair and refurbishment.  Accordingly, Superior may not recover on its claim for reimbursement of Lonestar employees' living and out

of pocket expenses as claimed in Group D.

**LIEN WAIVER**

The Court rejects Lonestar's argument that Superior waived its maritime lien by not

relying on the credit of the barges when furnishing necessaries, given this Court's prior holding

that the "due and payable" clause of the "Final Reconciliation" statement attached to the

Turnkey Agreement obligated Lonestar to make payment of the full contractual amount for

work performed under the Turnkey Agreement immediately upon execution of the Agreement.

Under maritime law, it is presumed that necessaries are furnished on the credit of the

vessel. *Colonial Press of Miami, Inc. v. The Allens K*, 277 F.2d 540, 541 (5th Cir. 1960); 46

U.S.C. § 31342(a)(3).   "[T]he statutory presumption in favor of a maritime lien is a strong

one" and, accordingly, the Fifth Circuit  is "usually reluctant to conclude that a supplier has

waived its lien." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 (5th Cir.

2003).  The Fifth Circuit therefore requires a "heavy burden" of proof be bourne before finding

that a  party has waived its right to a maritime lien.  *Id.* at 474.

The party seeking waiver of a federal  maritime lien must show that the creditor

"deliberately intended to forego the valuable privilege which the law accords and [instead]

look *solely* to the owner's personal credit."  *Id.* at 474 *quoting Gulf Oil Trading Co.,* 757 F.2d

at 750 (emphasis added).   Stated differently, the strong presumption against waiver of a

maritime lien may be rebutted by the party attacking this presumption only on a showing that

"the personal credit of the owner . . . was solely relied upon", thus permitting an inference that

the supplier "purposefully intended to forego the lien."  *Id.* at 471 *citing Equilease*, 793 F.2d at

605-606; *see also Pacorini USA, Inc. v. M/V ROSINA TOPIC*, 127 Fed. Appx. 126, 2005 WL

678199, 2005 AMC 1210 (5th Cir. 2005) *citing Gulf Oil Trading Co. v. M/V CARIBE MAR*,

757 F.2d 743 (5th Cir. 1985).  Accordingly, the Fifth Circuit has explained that "[i]f the

evidence shows that the claimant relied on the credit of the vessel *to some extent,* we will not

find a waiver of the maritime lien." *Maritrend,* 348 F.3d at 473 (emphasis in original).

Here, Lonestar has failed to provide sufficient evidence to establish that Superior

purposefully intended to forego its maritime lien rights by relying solely on Lonestar's personal

credit simply by executing the Turnkey Agreement.  Indeed, the evidence establishes the

opposite.  The BRAs provide that in the event of default by Lonestar, Superior "shall be

entitled to all remedies and/or lien rights granted to it by the General Maritime Law of the

United States of America." [Exhibit P-1, p. 1-9, ¶ 11.1 and Exhibit P-2, p. 2-9, ¶ 11.1].  While

the Turnkey Agreement contains no such provision, the Turnkey Agreement *does* provide that,

with the exception of  paragraphs 4 through 7, which define the scope of the work, the method

of payment for the work, the time for completion of the work, and the penalty for untimely

completion of the work, it "shall not be construed as a substitution/alteration and therefore

does not void any of the provisions of the Head Barge Refurbishment Agreement."

Thus, while the Turnkey Agreement is a separate contract, it clearly provides that the

provisions contained in the original BRAs, including the provision preserving Superior's lien

rights, remained in effect.  Superior merely contractually provided itself with an *additional*

contractual benefit to procure payment; it did not purposefully forgo its maritime lien rights.

Furthermore, the exhibits submitted by Superior belie any argument that Superior waived its lien rights.  In response to an October 7, 2008 letter from Chief Idisi, inquiring about what Superior would require to deliver the barges and provide Lonestar with a "certificate of no liens", Mr. Verret set forth two conditions, one of which was that Lonestar pay Superior the outstanding sums which were due. [P 32; P 25].  Mr. Verret's  response clearly evidences that Superior was indeed relying on the credit of the vessels, at least to some extent, to ensure payment for the work it performed.[3]

In sum, the existence of the "due and payable" clause in the "Final Reconciliation" statement attached to the Turnkey Agreement is insufficient to establish that Superior intended to solely rely on Lonestar's credit, or to permit the inference that the Superior purposefully intended to forgo its maritime lien on the barges.  Thus, Lonestar has failed to overcome the presumption that Superior relied on the credit of the vessels, at least to some extent, when furnishing necessaries to the barges. The Court therefore holds that Superior did not waive its maritime lien.

**Louisiana Law**

The BRAs contain a choice of law clause providing that the agreements "be construed and performed under the laws of the State of Louisiana."  [Exhibit P-1, p. 1-7, ¶ 8.1 and Exhibit P-2, p. 2-7, ¶ 8.1].  The Turnkey Agreement contains no such provision.  However, for

---

[3]Chief Idisi's reference to a "certificate of no liens" is indicative that he recognized Superior's lien rights.

those reasons set out above, and for the reasons set out in this Court's Reasons for Ruling on Cross Motions for Summary Judgment [rec. doc. 158], the choice of laws provisions, like the non-waiver of maritime lien clauses, remain in effect.   Moreover, it is clear that the choice of law clauses are valid.  "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable." *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc*., 585 F.3d 236, 242 (5th Cir. 2009).  S*ee also St. Paul Fire & Marine Ins. Co. v. Board of Com'rs*, 2011 WL 890934, * 3 (5th Cir. 2011) (unpublished). The parties' choice of law clause in an admiralty case will govern "unless the [chosen] state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Servs., Inc*., 851 F.2d 1514, 1517 (5th Cir. 1988).  S*ee also St. Paul, supra*. The choice of law clauses here meet both prongs of this test.  Louisiana has a substantial relationship to the parties; Superior is a Louisiana corporation and the work under the contracts at issue was performed in Louisiana. Finally, neither party argues that Louisiana law conflicts with any fundamental purposes of maritime law, or that the application of Louisiana law would be unreasonable or unjust.

**GROUP A CLAIMS**

Under Louisiana Civil Code article 1994, a party to a contract is "liable for the damages caused by his failure to perform a conventional obligation." A failure to pay money due under a contract is a failure to perform under Louisiana Civil Code article 1994. *Occidental Chemical Corporation v.  Louisiana Public Service Commission*, 494 F.Supp.2d 401, 416

(M.D. La. 2007).

The Court holds that the Barge Refurbishment Agreements, Turnkey Agreement and change orders signed by both parties constitute valid and enforceable contracts between Superior and Lonestar.

The Court holds that recovery for the items claimed in Group A is not precluded by the final reconciliation agreed to by the parties in connection with the Turnkey Agreement.  The Court therefore rejects Lonestar's argument to the contrary.

The language of the Turnkey Agreement clearly states that the Turnkey Agreement provided only for the completion of the refurbishment work that had been previously conducted under the time and materials arrangement.  The title of the Turnkey Agreement reads as follows:

> Turnkey Contract Agreement for the Completion of Refurbishment
> Works which were on Time & Material and Thus Outside
> Contractor's Scope of Work as Defined in the Head Barge
> Refurbishment Contract of 19th Day of April, 2006 Entered Into By
> and Between Superior Derrick Services, L.L.C., ('Contractor') and
> Lonestar Drilling Nigeria Ltd. ('Owner')

[ P-3, 3-1].  The Turnkey Agreement sets forth in Exhibit A (consisting of Appendixes A through F), the scope of work to be undertaken pursuant to the Turnkey Agreement.  [*Id*. at 3-5 through 3-19].  The Agreement further states that this scope of work "shall not include any of contractor's scope of work under the existing Head Barge Refurbishment Agreement of 19th of April 2006 but shall include all of the scope of work as per Exhibit A . . . all of which are the subject matter of this Turnkey Contract"  and that "the scope of work as per exhibit A is

without prejudice to the scope of work that remains uncompleted under [the] Head Barge Refurbishment Agreement of 19th of April, 2006." [*Id.* at 3-1 and 3-2].

Moreover, the Turnkey states that "this agreement shall not relieve Contractor of its contractual obligations or any part thereof under the  Head Barge Refurbishment Agreement of 19th of April 2006 *but does relieve owner of any further payment obligations under the Time and Material arrangement* to which this Turnkey contract is entered into to replace, except as provided in the statement of reconciliation attached hereto."  [*Id.* at 3-2] (emphasis added). The Agreement provides for a contract price of $3,396,901.37, and that "Owner, save and except this amount is not indebted and contractor is not entitled to any further claim or amount whatsoever *in respect of refurbishment works on Rigs 203 & 204 as specified in Exhibit A attached hereto*." [*Id.* at 3-1 (emphasis added)].

Thus the express language of the Turnkey Agreement reveals that the intent of the Agreement was two-fold:  (1) to replace the time and material arrangement to address additional work which was not included in the scope of work of the BRAs; and (2) to set a fixed Turnkey price covering only the work set forth in the scope of work attached to the Turnkey Agreement, this price relieving Lonestar of any further payments under the defunct time and material arrangement and any further payments for the scope of work set forth in the Turnkey Agreement.

Therefore, it is clear that the final reconciliation does not relieve Lonestar from all payment obligations under the BRAs, but, rather, only those payment obligations under the

14

time and materials arrangement which was being replaced by the Agreement, and any further payment obligations for the new and additional work set forth in the Turnkey Agreement. While the final reconciliation does contain some concessions relating to work under the BRAs, it by no means appears to have been intended to settle or foreclose all claims for payment relating to the BRAs.  To the contrary, the parties expressly limited Lonestar's liability solely to claims for payment presented by Superior relating to the scope of work set forth in the Turnkey Agreement.

The testimony presented at trial supports the Court's conclusion that the final reconciliation did not settle all financial disputes between the parties which preceded the execution of the Turnkey Agreement. Both Mr. Aweto and Mr. Gardner testified that the Turnkey Agreement was confected to replace the time and materials arrangement which had been verbally agreed to by the parties because it was not cost effective for Lonestar.

Mr. Esiegbuya likewise testified that the purpose of his visit to Louisiana in February through March 2008, prior to the execution of the Turnkey Agreement, was to review the time and materials arrangement and that the original BRAs were not his focus.

Both Mr. Aweto and Mr. Gardner verified that by the Turnkey Agreement, work that had been reserved by Lonestar for itself was directed to Superior by written contract.  Thus, the parties defined a new scope of work for Superior, which was outside the scope of work in the BRAs, for a fixed price.  Mr. Gardner further testified that in determining the price for the new scope of work, there were concessions made by both parties, which are specifically set forth as

15

agreed upon in the financial reconciliation.  However, according to Mr. Gardner, the price to be paid to Superior was solely for the  new scope of work defined in the Turnkey Agreement. The Court finds this testimony credible.

**Sub-hull Cost**

The BRAs required Superior to procure and install a sub-barge, or sub-hull, on each barge. [P-1, at 1-13; P-2 at 2-13].  At the time of contracting, the cost of constructing the sub-hulls was not known.  Accordingly, the cost for construction of the sub-hulls is contained in the estimated cost section of the cost summary. [P-1 at 1-30; P-2 at 2-29].  The evidence demonstrates that the contract price of each of the BRAs, $14,490,462.00, was paid in full. This sum included $2,276,400.00, which sum represented the estimated cost for the construction of a sub-hull for each barge.

Superior entered into a contract for construction of the sub-hulls with Bender after Chief Idisi approved Bender's $3,100,000.00 bid per sub-hull.  As construction on the sub-hulls progressed, Bender's price increased, due, in part, to increased steel weight.  After adjustments for ballast work which was not performed by Bender, Superior ultimately paid Bender a total of $4,371,000.00 for each sub-hull.  This is supported by the testimony of both Mr. Garner and Mr. Alexander, which the Court finds credible.

According to Mr. Alexander, who the Court finds credible on this point, of the total price paid to Bender, Lonestar paid a total of $2,776,400.00 per sub-hull, this sum representing the contractual estimated price plus an additional $500,000.00 payment per barge for steel overage.  This $1,000,000.00 payment for steel overage was initially disputed by Lonestar.

16

However, Lonestar conceded this amount in the meeting of March 11, 2008, as evidenced by the meeting minutes and final reconciliation attached to the Turnkey Agreement. [D-45 and P-3 at 3-4].

Superior does not seek the difference between the actual cost paid by Superior to Bender and the total amount paid by Lonestar. Rather, Mr. Alexander testified that because of the difference between the amount stated in the cost summary in Exhibit G of the BRAs, $13,022,762.00, and the contract price of $14,490,462.00, a difference of $1,467,700.00 per barge, Mr. Verret instructed Mr. Alexander's predecessor, Mr. Tannehill, to apply that difference to sums owed by Lonestar for the sub-hulls. The Court find's Mr. Alexander's testimony on this point credible. [*See also* P-8, at 8-1].

Accordingly, the total outstanding sum due under the BRAs per sub-hull, per barge is $126,900.00, or total under both BRA's for both barges of $253,800.00. Superior is awarded this amount.

**Sub-hull 15% Mark-up**

Under the estimated Cost Summary contained in Exhibit G of each BRA, Superior was to receive a 15% contractual mark-up on the cost of each of the sub-hulls. [P-1, at 1-30 and P-2, at 2-29]. The Court accepts the testimony of Mr. Gardner that this mark-up was to be applied to the actual cost, as opposed to the estimated cost, of the sub-hull construction. The Court further holds that Superior has not conceded or otherwise waived its entitlement to this contractually agreed upon sum. The actual cost of each sub-hull was $4,371,000.

17

Accordingly, Superior is contractually entitled to 15% of that amount for each barge, a total of $1,311,300.00.  Superior is therefore awarded this amount.

**Builder's Risk Insurance**

The Court holds that Superior has provided insufficient proof to support its contractual claim for the payment of builder's risk insurance premiums.  Under paragraph 5.1 of the BRAs the barges were to "be kept fully insured at the expense of Owner [Lonestar] under a full form builder's risk policy. . . ."  Paragraph 5.1 provides in pertinent part:

> Until the Barge has been completed and physically delivered to Owner, the Barge and all material, machinery and equipment to be installed in the Barge, including items furnished by Owner and delivered to the facilities of Contractor to be used in the construction thereof, shall be kept fully insured at the expense of Owner under a full form builder's risk policy (including pre-keel), including loss or damage caused by strikers, locked out workmen or persons taking part in labor disturbances or riots, or civil commotions, and with endorsements attached therein, covering losses or damages caused by vandalism, sabotage and malicious mischief, rising water, hurricane and wind storm. The value of said policy shall be in an amount at least equal to the value of the completed part of the work, plus the value to Owner of materials and equipment received by Contractor for use and/or incorporation in the Barge.

[P-1, at 1-5 and P-2, at 2-5].

Pursuant to the BRAs, Superior took it upon itself to procure builder's risk insurance coverage at a cost of $216,000.00.[4]  By written change order dated July 27, 2006 (change order No. 5), Superior requested payment of the premium by Lonestar.  Lonestar formally rejected this change order in writing on August 4, 2006. [P-10].  By email that same date forwarded to

---

[4] The change order prepared by Mr. Tannehill incorrectly requested $329,885.07.   However, Mr. Alexander testified that the correct of amount of premium paid by Superior was $216,000.00.

Mr. Tannehill, Mr. Berisford explained that Lonestar already had "all risk insurance that covers us in the Superior shipyard." [P-10, at 10-2].  Mr. Berisford candidly and credibly explained at trial that he had been told that Lonestar had builder's risk, but in his email, incorrectly referred to the insurance as "all risk."  Mr. Berisford further credibly testified that he was never asked to provide Superior with a copy of the Lonestar policy he referred to in his email, nor was he ever told that this Lonestar policy was insufficient –  the subject was never brought up again until after commencement of the instant litigation.

Mr. Gardner likewise testified that he did not make any evaluation as to whether Mr. Berisford was correct in his assertion that Lonestar had procured appropriate insurance, nor did he make any determination as to whether the coverage that Lonestar had procured was sufficient.  Moreover, Superior failed to introduce a copy of the insurance policy procured by Lonestar demonstrating that the coverage it provided was insufficient, and has not provided a copy of the insurance it claims to have procured on Lonestar's behalf.

The evidence shows that Lonestar had in place insurance which it believed provided sufficient builder's risk coverage.  There is no credible evidence to the contrary.  Superior has thus failed to demonstrate that this coverage was insufficient, necessitating the procurement of additional coverage.  Furthermore, even if the coverage procured by Lonestar was insufficient, which has not been proven, it is clear that any builder's risk insurance required by the BRAs is entirely for Lonestar's benefit and not for the benefit of Superior.  Under Louisiana law, a term or condition can be waived by a party for whose benefit it has been established.  *See Morrison*

19

*v. Mioton*, 163 La. 1065, 113 So. 456, 1072 (La. 1927); *Bach v. Slidell*, 1 La.Ann. 375 (1846);

La. C.C. art. 1780, Revision Comments – 1984.

For these reasons, Superior will not be awarded any sum for the premiums it paid for

builder's risk insurance coverage.

**Choke Manifolds**

The Revised Original Scope of Work set forth in Exhibit A of the BRAs required

Superior to provide a 10,000 psi choke manifold "including valves and gauges" which

admittedly, according to Mr. Gardner, was not explicit in the number of valves, choke wings or

buffer chambers.[5]  [P-1, at 1-17].  The price for this choke manifold is not included in the

estimated section of the Cost Summary of Exhibit G of the BRA.  Accordingly, the Court

concludes that the price is included in the firm price set forth in the Cost Summary of Exhibit

G ($7,873,462.00) for items listed in the revised original scope of work set forth in Exhibit A.

[P-1 at 1-30].  A drawing of a proposed choke manifold was submitted by Superior to Lonestar

for approval.  Mr. Berisford testified that the drawing was not approved by Lonestar because

the manifold did not have sufficient chokes to meet their specifications, which Superior had

verbally agreed to meet when the BRAs were being drafted.  About one to two weeks later,

Lonestar received change orders (Nos. 41 and 42) dated April 25, 2007 and signed by Mr.

Tannehill on May 25, 2007, wherein Superior requested that an additional $86,428.00 be paid

---

[5]The corresponding page of the other BRA introduced as P-2 was not included in the exhibit.  However,
Mr. Gardner testified that his copy of the BRA included that page, and that an identical page should have been
included in the exhibit.

by Lonestar for each choke manifold, for a total of $172,956.00.  Mr. Berisford refused to approve these change orders.

Mr. Garner testified that the choke manifolds were procured through Alpha Oilfield Equipment Company.  On the Lonestar Customer Deposit spreadsheet, a document prepared by Superior which lists how the Lonestar funds received by Superior were disbursed, the full price is reflected as having been paid on September 5, 2007 by Superior using Lonestar funds.  Mr. Alexander testified that, with the exception of a few items not applicable to this claim, there were no specific authorizations from Lonestar for Superior to apply the Lonestar funds to any particular invoice or group of invoices.  Furthermore, while this spreadsheet lists items for which payment was approved by Lonestar by specifically numbered change order, the payment to "Alpha Oilfield" for $172,856.00 does not reflect the payment was authorized by any change order or, more specifically, change order numbers 41 or 42. [D-148, at 0935].

This same amount ($172,856.00) is listed on Lonestar's "Utilisation of Payments" spreadsheet as having been paid to Alpha Oilfield Equipment Company from an August 21, 2007 transfer of funds in the amount of $25,000,000.00. [P-33].  However, Mr. Esiegbuya testified that this document was prepared by a Lonestar financial controller at his request in the first week of 2008, after the payments had been made by Superior, from invoices sent by Mr. Tannehill to the controller at his request.  The Court therefore holds that this document does not constitute any authorization by Lonestar for the payment of this or any other sum; it merely reconstructs the disbursements of Lonestar funds by Superior.

21

When the parties met prior to execution of the Turnkey Agreement, Lonestar  disputed the $172,856.00 payment made by Superior for the choke manifolds.  Accordingly, in the final reconciliation attached to the Turnkey Agreement, the parties agreed to credit Lonestar the full amount of this payment. [P-3 at 3-4].  The final reconciliation clearly expresses the reason for this agreed upon concession in Note 1 to the final reconciliation as follows: "Change Orders No 41 & 42 not approved by LSD because it is part of the contractor scope of work under the Barge refurbishment Agreement of April 19, 2006." [P-3 at 3-4].

In light of the above, the Court holds that the cost of the choke manifolds was included in the original price of the BRAs.  The BRAs did not specify the number of valves, chokes, wings or buffer chambers agreed upon and, accordingly, Superior cannot now impose a contractual limit on these components.  Lonestar did not authorize the payment of the additional funds requested by change orders 41 and 42, and properly rejected Superior's demands for such payment.

Furthermore, even if this was not the case, it is clear that the parties expressly agreed that the additional funds requested by change orders 41 and 42 were not properly requested by Superior because the requested sums were already included in the BRA contract price.  This express agreement by the parties precludes Superior's claim in this litigation.  The Court therefore will make no award to Superior for the claimed additional costs associated with the choke manifolds.

22

**Tank Cleaning**

By change orders dated September 14, 2006 (change order numbers 12 and 13),
Lonestar approved and subsequently paid $77,925.72 per barge (a total of $155,851.44), the
estimated cost for cleaning the tanks on each barge by Clean Harbors Environmental Services
($135,523.00), plus a fifteen percent mark-up in favor of Superior. [P-9, at 9-1 and 9-9].  A
quote attached to each change order estimates that the tank cleaning services would require
two crews for twelve days.  The quote further states that "CHES believes the pricing is
sufficient to complete the project as described, but no guarantee is given or implied. The
overall cost for the project may change if: 1) the scope of work changes or 2) additional time is
required on site." [P-9 at 9-4 and 9-12].

By change orders dated June 7, 2007 (change orders numbers 12A and 13A), Superior
requested payment of $61,701.38 and $114,008.36 respectively (a total of $175,709.74),
representing "additional days and expenses required to complete the cleaning of the rig tanks
 . . . ."  [P-9 at 9-5 and 9-13].  Lonestar rejected both change orders.  Mr. Aweto testified that
he was present when the tanks were being cleaned in February 2007.  Lonestar rejected these
supplemental change orders because, after asking Mr. Aweto how long the job took, Chief
Idisi didn't see any reason why he had to pay twice for the same job.

No invoices for the claimed additional time or additional work covered by the
supplemental change orders were introduced in support of this claim for expenses.[6]  Moreover,

---

[6]The Court sustained a defense objection to the introduction of documents which purport to support this claim.
Accordingly, the documents were the subject of a proffer. [*See* P-46].

when Mr. Gardner was questioned as to whether he was familiar with any extra time spent on site or additional work performed by Clean Harbors, he testified that he could not recall the details.  He further testified that while supplemental change orders were issued for additional work, he could not recall exactly what additional work was performed by Clean Harbors which was billed to Superior. No representative of Clean Harbors testified.

Although after prompting by Superior's counsel, Mr. Gardner suggested that extra time was required by Clean Harbors to perform its work, the Court cannot accept this testimony.  It is clear to the Court that Mr. Gardner had insufficient recollection of the details of the services which were provided by Clean Harbors for Mr. Gardner to provide an accurate estimate of the time involved.  Indeed, it did not appear to the Court that Mr. Gardner knew of the original twelve day estimate, much less that he was aware of any additional time over that estimate which was required to complete the work.

Finally, while both Mr. Gardner and Mr. Alexander testified that Superior paid the amount requested by each supplemental change order, because there has been insufficient proof that the amounts were contractually owed by Lonestar, that is, that additional time was required to perform the work, that additional time was actually expended or that additional work was actually performed by Clean Harbors, this testimony is of no evidentiary import.

For these reasons, the Court finds that Superior has failed to provide sufficient proof of its contractual entitlement to reimbursement of the amounts requested by rejected supplemental change order numbers 12A and 13A.  The Court therefore will make no award to Superior for

the claimed additional costs associated with the cleaning of the tanks on each barge by Clean Harbors Environmental Services.

**Transportation and Drydock Expenses**

The American Bureau of Shipping required the inspection of the bottoms of the barges before the sub-hull mating and joining procedure could begin.  This inspection required that the barges be towed by Smith Maritime from Superior's facility in New Iberia to and from Signal International's facility and dry dock in Sabine Pass near Port Arthur, Texas.  In his "Cost of Services" summary, Herman J. Schellstede estimated the costs for this work to be $918,500.00. [P-6-1].  The Court accepts Mr. Alexander's testimony that the total amount actually incurred and paid by Superior in connection with the bottom inspection of the barges was  $1,079,276.30.  It is undisputed that Lonestar only reimbursed Superior $ 918,000.00. [*See* P-28].

There is no claim by Lonestar that it did not agree to have the bottom inspection performed.  To the contrary, a note at the bottom of the estimate indicates that Chief Idisi authorized Schellstede to proceed. [P 6-1].   Rather, Lonestar argues that the invoices submitted to Superior by Smith Marine and Signal total less than the original estimated cost actually paid by Superior utilizing Lonestar's funds, and, accordingly, no outstanding amounts are due.  Lonestar's argument is not supported by the record evidence or the testimony of Mr. Gardner and Mr. Alexander on this issue, which the Court accepts.

Superior submitted invoices from Smith Marine for $310,000.00 ($155,000.00 per barge) for towing the barges from New Iberia to Sabine Pass [P-6-21]; the documentary evidence also establishes that this same amount was invoiced for towing the barges back from Sabine Pass to New Iberia [P-6-110, P-6-112, P-6-114, P-6-115], for a total of $620,000.00. Signal billed a total of $175,00.00 paid in three "milestone" payments of $100,000.00 due at the time the contract was awarded, $40,000.00 due upon completion of the first barge and $35,000.00 due upon completion of the second barge. [P-6-24, P-6-38, P-6-26, P-6-39, P-6-22, P-6-42].

Signal additionally invoiced Superior for $216,402.63 [P-6-44] (included in an April 11, 2008 payment of  $251,402.63, along with the third $35,000.00 milestone payment evidenced in D-148 at 0948 and P-6-39) and $18,974.29 [P-6-93], which sum was not re-invoiced until December 4, 2008 [P-6-94], and hence is not included in Superior's "Lonestar Customer Deposits" exhibit, which included only entries through May 2008 [D-148 at 0949].  Superior was additionally billed $6551.08 for a survey performed by A.B. Marine Consulting, Inc. by invoice dated March 13, 2009 [P-6-109], which was not included in  the "Lonestar Customer Deposits" exhibit which ended in May 2008.

Finally, the evidence supports a finding that Superior paid $37,000.00 for "engineering, project management and procurement services". [P-6-1, item 7].  These items alone exceed the estimated costs associated with the bottom inspection by $155,428.00.  While this sum does not exactly match the amount claimed by Superior, the Court credits the testimony of Mr.

Alexander that Superior 's business records demonstrate that it paid excess costs totaling $161,276.34.  Superior is therefore awarded $161,276.34, which represents the costs paid by Superior in excess of the estimate for transportation and drydock expenses associated with the inspection of the bottoms of the barges.

**GROUP B CLAIMS**

Andy Gardner testified, without contradiction, that the post-Turnkey Agreement change orders claimed by Superior in Group B were approved by Lonestar and, with the exception of change orders 127 and 128, the work specified therein was 100 % complete and of  "first class" quality.  The Court accepts Mr. Gardner's uncontradicted testimony on this point.

With respect to change orders 127 and 128, the Court granted the defense Motion for Involuntary Dismissal, in part, limiting Superior's claim to $2200.00 per invoice, said sum representing the cost of the ventilators without installation.

Accordingly, the Court concludes that Superior is contractually entitled to recover a total of $941,177.91 for amounts claimed by Superior for post-Turnkey Agreement Change Orders in Group B as follows:

1. C/O 107 Move 203 Canrig Unit $37,000.00
2. C/O 108 Move 204 Canrig Unit $37,000.00
3. C/O 109 Remove 203 Canrig Unit $52,000.00
4. C/O 110 Coat 203 Potable Water Tanks $66,000.00
5. C/O 111 Coat 204 Potable Water Tanks $66,000.00
6. C/O 112 Replace 203 Agitator Building Ventilator $43,500.00
7. C/O 113 Replace 204 Agitator Building Ventilator $43,500.00
8. C/O 114 Remove 203/204 Generators $95,120.00
9. C/O 117 Provide 203 Diesel $19,194.72
10. C/O 118 Provide 204 Diesel $20,091.19

11. C/O 119 203 Equipment Load Out $82,412.00
12. C/O 120 204 Equipment Load Out $82,412.00
13. C/O 121 Move 203 Cold Start for Compressors $ 4,750.00
14. C/O 122 Move 204 Cold Start for Compressors $ 4,750.00
15. C/O 123 Upgrade 203 Filter Syst. For Compressors $ 3,200.00
16. C/O 124 Upgrade 204 Filter Syst. For Compressors $ 3,200.00
17. C/O 126 Build Work Deck Around Mud Pump 204 $ 5,400.00
18. C/O 127 Ventilator for in 203 Quarters $ 2,200.00
19. C/O 128 Ventilator for 204 Quarters $ 2,200.00
20. C/O 129 Replace Demco Valves 203 $24,867.60
21. C/O 130 Replace Demco Valves 204 $16,578.40
22. C/O 131 Repair of 203 Ideco Pump $12,375.00
23. C/O 132 Repair of 204 Ideco Pump $12,375.00
24. C/O 133 Repairs to 203 Double Bearing Generator $64,140.00
25. C/O 134 Assist in Cutting Umbilical for 203 Closing Unit $ 4,124.00
26. C/O 135 Assist in Cutting Umbilical for 204 Closing Unit $ 4,124.00
27. C/O 136 Complete 203 ABS requirements by FSS $ 30,082.00
28. C/O 137 Complete 204 ABS requirements by FSS $ 30,082.00
29. C/O 138 Supply Double Bearing Generator to 203 $ 72,500.00

Lonestar seeks the return of 10% of the above sums pursuant to a provision of the BRAs which required payment of change orders "similar to the treatment of Progress Payments discussed in exhibit E . . . on a percentage of completion of work basis, less a ten percent (10%) retention", the retention being paid thirty days after the delivery date.   [P-1 at ¶ 4.4; P-2 at ¶ 4.4].  The Court will make no reduction to the award based on this contractual provision because the enforcement of the provision at this time would lead to an absurd result.

Exhibit E sets the dates on which progress payments were to be made by Lonestar to Superior.  There is no requirement in exhibit E requiring that any retention be withheld on any progress payment.  To the contrary, each of the five progress payments is stated as an exact sum, the total of which equals the full contract price of $14,490,462.00.  Thus, there is no

"similar" treatment of progress payments and payments of change orders as set forth in ¶ 4.4 of the BRAs.

Furthermore, the purpose of withholding a retention is to ensure that no payment for work which is not completed, or is completed unsatisfactorily, will be made until the work is completed and deemed satisfactory.  In this case there is no dispute that the work specified in the above change orders was 100 % complete and of satisfactory quality. Since the work was satisfactorily completed, any retention which had been made by Lonestar would now be due Superior.  Lonestar's claim for retention is therefore rejected.

**GROUP C CLAIMS**

**Oral or Implied Contract**

The Court concludes that there was valid oral or implied contracts between Superior and Lonestar for the work performed by Superior in Group C.  However, no payment is owed for the work performed by Superior.  Accordingly, Superior may not recover the amounts claimed in the Group C claims section.

Legal agreements have the effect of the law upon the parties, and the parties shall be held to full performance of the obligations flowing therefrom. *L&A Contracting Co., Inc. v. Ram Industrial Coatings, Inc.*, 762 So.2d 1223, 1230 (La.App. 1st Cir. 2000). Further, contracts may only be modified by mutual consent. *Id.* at 1232; *Cajun Constructors, Inc. v. Fleming Const. Co., Inc.*, 951 So.2d 208, 214 (La.App. 1st Cir. 2006).  Thus, while modification can be presumed under certain circumstances, one person may not change the terms unilaterally.  *L&A*

*Contracting Co., Inc*, 762 So.2d at 1232*; Cajun Constructors, Inc.*, 951 So.2d at 214.

The BRAs require that changes in the contractual scope of work be authorized by written change order signed by both parties. [P-1 and P-2 at ¶ 4.1 and ¶ 4.2].  However, under Louisiana law, written contracts may be modified by oral contracts and by the conduct of the parties, even when the written contract contains a provision that an owner is liable only if a change order is in writing.  *Id. quoting Pelican Elec. Contractors v. Neumeyer*, 419 So.2d 1, 5 (La.App. 4th  Cir.), *writ denied*, 423 So.2d 1150 (La.1982); *Bonvillain Builders v. Gentile*, 29 So.3d 625, 631 (La.App. 1st Cir. 2009); *Cajun Constructors, Inc.*, 951 So.2d at 214.  The party who asserts that an obligation has been modified must prove the facts or acts giving rise to the modification. *L&A Contracting Co., Inc*, 762 So.2d at 1233; *Bonvillain Builders*, 29 So.3d at 632; *Cajun Constructors, Inc.*, 951 So.2d at 214.

An implied in fact contract is one which rests upon consent implied from the facts and circumstances showing mutual intention to contract. *Morphy, Makofsky & Masson, Inc. v. Canal Place 2000*, 538 So.2d 569, 573 (La. 1989). Such a contract, although non-written, has the same legal effect as an express, written agreement. *Id.*  An implied contract may exist where there has been no price agreed upon or any agreement as to compensation reached and, in such cases, the missing term is supplied by the court and the party performing the services is paid a reasonable sum determined by the court. *Id.* at 574; *Dumas and Associates, Inc. v. Lewis Enterprises Inc.*, 704 So.2d 433, 437-438 (La. App. 2nd Cir. 1997).

Here, Mr. Gardner candidly testified that at the time Superior performed the work specified for the items listed in Group C, Superior did not intend to bill Lonestar for any of this work and, hence, Superior did not expect any payment or compensation for this work.  Mr. Garner further testified that Superior only decided to seek payment for these services in this litigation because Superior did not receive the full Turnkey price it believed to be owed from Lonestar.

Lonestar personnel witnessed the work being performed by Superior and did not object to Superior's undertaking, presumably because they believed, correctly or incorrectly, that the work was in Superior's contractual scope of work and hence required no additional payment, or because they saw this work as being done by Superior as a business accommodation by Superior for Lonestar.  By its actions, Lonestar therefore agreed that Superior perform the work and further agreed that it would not be required to pay Superior any additional compensation for this work.

Thus, at the time the work was performed there was an agreement, implied in fact, as to compensation, namely, that no additional compensation would be required from Lonestar for this work performed by Superior.

At the time these agreements were confected, the parties were on good terms and it is therefore reasonable to conclude that Superior agreed to perform this work at no additional cost to Lonestar as a business accommodation, perhaps to obtain future business from Lonestar.  Indeed, that was exactly Mr. Tannehill's testimony at the hearing on the motion to

31

vacate the arrest of the barges and alternatively to fix security. [rec. doc. 26, pg. 29-30, 42]. It was not until after the work had been completed, that the relationship soured and this suit ensued. Only then did Superior unilaterally decide that it would seek payment from Lonestar for the services rendered. This Superior is not entitled to do.

Thus, while Superior has proven that there was either oral or implied contracts with respect to the work specified in the items listed in Group C, no recovery may be had because the agreed upon terms of these contracts did not require payment of any amount by Lonestar for the work performed by Superior. Stated differently, the terms of the oral or implied contracts proven by Superior for the work specified in the items listed in Group C preclude recovery of any amount from Lonestar because the implied in fact agreement between Superior and Lonestar was that there would be no additional compensation for the work. Superior intended to perform the work at no additional cost to Lonestar, Lonestar did not object (thus evidencing its consent) and Superior cannot thereafter unilaterally change its mind.

No evidence was presented to show that Lonestar subsequently consented to pay Superior for these claimed items of work, and the Court cannot find such consent is implied. Accordingly, the Court holds that Superior has failed to prove a modification of the original oral or implied contracts as mutual consent to pay Superior has not been proven.

### *Quantum Meruit* and Unjust Enrichment

Superior likewise cannot recover these claimed amounts on the basis of *quantum meriut,* or, in civilian terms, *actio de in rem verso* (unjust enrichment). "*Quantum meruit* is an

equitable remedy, based on former Civil Code article 1965, which provided that 'no one ought to enrich himself at the expense of another.'" *Sam Staub Enterprises, Inc.. Chapital*, 88 So.3d 690, 695 (La. App. 4th Cir. 2012) *citing Coastal Timbers, Inc. v. Regard*, 483 So.2d 1110, 1113 (La.App. 3rd Cir. 1986). Under Louisiana law, "there is a double limitation on the amount of recovery allowed under *quantum meruit*: 1) plaintiff cannot recover more than the actual value of his services and materials, plus a fair profit; and 2) plaintiff cannot recover more than defendant was enriched by plaintiff's services." *Morphy, Makofsky & Masson, Inc.*, 538 So.2d at 575; *Bieber-Guillory v. Aswell*, 723 So.2d 1145, 1151 (La. App. 3rd Cir. 1998).

*Quantum meruit* does not apply where an express or implied contract exists. *Morphy, Makofsky & Masson,*, 538 So.2d at 572 and 575; *Jackson v. Capitol City Family Health Center*, 928 So.2d 129, 131-132 (La. App. 1st Cir. 2005); *Gulfstream Services, Inc. v. Hot Energy Services, Inc.,* 907 So.2d 96, 100-101 (La. App. 1st Cir. 2005); *Sam Staub,* 88 So.3d at 695; *Dumas and Associates, Inc.*, 704 So.2d at 437-438. *See also* La.Civ. Code art. 2298. Here, the Court has found that oral or implied contracts covering the work specified for the claims set forth in Group C existed.  Accordingly, recovery  on the basis of *quantum meriut,* (in civilian terms, *actio de in rem verso)* is precluded.

To the extent that general maritime law independently provides for recovery on the basis of *quantum meruit,* the result is the same.[7]  As is the case under Louisiana law, *quantum*

---

[7]The jurisprudence is not clear as to whether the courts are applying *quantum meruit* do so based upon uniform federal maritime law principles or merely by adopting state law by express or implied reference.  The latter, however,  appears to be the basis for the majority of the decisions. *See e.g. Muller Boat Works, Inc. v. Unnamed 52% 2C House Barge,* 464 F.Supp.2d 127, 141 (E.D. N.Y. 2006) (applying New York substantive law);

*meruit* is an equitable remedy that requires that there be an absence of a contract.  *See e.g. Mid Atlantic Diesel v. Fulcher*, 603 F. Supp 1326, 1328 (E.D. N.C. 1985) (holding that because there was no contract formed any recovery by the plaintiff must stem from the equitable principles of *quantum meruit*, which allows one to recover the reasonable value of his services and materials furnished.).

Superior entered into oral or implied contracts for the work specified in the items listed in Group C  and is entitled to receive what they agreed upon, even if the deal they made was ultimately unprofitable because Superior received no further business from Lonestar.  This Court is not authorized under *quantum meruit* to substitute a more equitable result for Superior than that required by the contracts Superior agreed upon.  Moreover, even if this Court possessed that authority, this Court would decline to exercise its equitable powers because, under the circumstances presented in this case, equity does not dictate that Superior should recover the amounts claimed for services, work, materials, and supplies furnished to the barges under Group C, which it intended to furnish at no additional cost.

---

*Todd Shipyards v. M/V ANNA K*, 1981 AMC 1774, 1777 (E.D. La. 1979) (applying Louisiana substantive law); *Sea Byte, Inc. v. Hudson Marine Management Services, Inc.,* 565 F.3d 1293, 1298 and 1301 (11th Cir. 2009) (noting that "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law" and accordingly applying Florida state law); *In re Tasch, Inc*., 2001 WL 1398644, *17 (E.D. La. 2001) (applying Texas law); *Stewart & Stevenson Services, Inc. v. Superior Boat Works, Inc.*, 1996 WL 470642, *3-4 (E.D. La. 1996) (in a case where the contract specified that both the General Maritime Laws of the United States, as well as the laws of the State of Louisiana, would govern, applying Louisiana substantive law).

**Payment Not Due**

Louisiana law allows for the recovery of a payment that was not owed. La. Civ. Code Art. 2299.  It is undisputed that Lonestar paid $14,490,462.00, the full contract price due under the BRAs.  The Court holds, however, that Superior did not fully complete the scope of work required under the BRAs.  Rather, the Court accepts the testimony of Mr. Berisford, that at the time the barges were arrested, only 97% of the work contractually undertaken by Superior had been completed. [P-41 at 41-30].[8]

While Lonestar requests the return of the entire final progress payment of $2,120,231.00 on grounds that the payment was not due until completion, under the circumstances presented, that result is not warranted, given that all but 3% of the work contractually assigned by Lonestar to Superior was completed.  Accordingly, the Court will award Lonestar a credit of 3% of the contractual price of each BRA, $434,713.86, for a total under both BRAs of $869,427.72, that amount representing funds paid by Lonestar which were not earned by Superior.

---

[8]Mr. Gardiner acknowledged that not all of the work on the barges was completed.  He estimated that about 99% of the work was completed.  The Court accepts Mr. Berisford's testimony on this point.

**SUMMARY**

On the basis of the foregoing findings of fact and conclusions of law, the Court finds

that the plaintiff is entitled to recover the following damages:

| | |
|---|---|
| Turnkey Agreement Balance | $3,000,000.00 |
| Group A Claims | |
| Sub-hull Cost | $253,800.00 |
| Sub-hull Mark-up | $1,311,300.00 |
| Transportation/Drydock | $161,276.34 |
| Group B Claims | $941,177.91 |
| Group C Claims | $0 |
| Group D Claims | $0 |
| Sub-Total | $5,667,554.25 |
| Credit for Payment not Due | $869,427.72 |
| Total | $4,798,126.53 |

**Pre-Judgment Interest**

Under maritime law, an award of pre-judgment interest "is the rule rather than the

exception, and, in practice, well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d

1026, 1028 (5th Cir. 1986); *Couch v. Cro-Marine Transport, Inc*., 44 F.3d 319, 328 (5th Cir.

1995); *Koch Refining Co. v. Jennifer L. Boudreaux,* 85 F.3d 1178, 1183 (5th Cir. 1996).  A trial

court only has the discretion to deny pre-judgment interest where peculiar circumstances, not

36

present in this case, would make such an award inequitable.[9] *Reeled Tubing*, 794 F.2d at 1028;

*Koch Refining Co.,* 85 F.3d at 1183.

It is within the discretion of the Court to select an equitable rate of pre-judgment

interest*,* and the Court may look to reasonable guideposts, including the interest rate set forth

in 28 U.S.C. § 1961 for judgments*. Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL

708076, *24 (E.D. La. 2008);  *Reeled Tubing*, 794 F.2d at 1029; *Marine Overseas Services,*

*Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227,1237 (5th Cir. 1986); *In Re: M/V NICOLE*

*TRAHAN*, 10 F.3d 1190, 1196-97 (5th Cir.1994).

The general rule in the Fifth Circuit is that prejudgment interest is to be awarded from

the date of the loss to ensure the plaintiff is compensated in full.  *Reeled Tubing*, 794 F.2d at

1028.  However, the Fifth Circuit has also recognized that there are circumstances when a trial

court may properly exercise its discretion to award prejudgment interest only from the date of

judicial demand. *Id*. at 1028 and fn. 2.

Given that the sums awarded in this case were due at varying times, making it difficult

if not impossible to determine the date of loss of each amount awarded, and further given that

Superior delayed filing the instant lawsuit despite the fact that some of these sums were

outstanding for some time, as well as the fact that the amount awarded to Superior is less than

the amount initially claimed by Superior (although not so substantially less so as to preclude an

---

[9]"Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff." *Reeled Tubing*, 794 F.2d at 1028 (citations omitted).

award of prejudgment interest altogether), the Court will exercise its discretion to award prejudgment interest from the date of judicial demand. *See United States v. Peavey Barge Line*, 748 F.2d 395, 402 (7th Cir.1984) *cited in Reeled Tubing*, 794 F.2d at 1028 fn. 2.

Based on the above, the Court finds that an award of prejudgment interest from the date the instant action was filed (March 26, 2009) at the rate of 0.17% monthly, which is the quoted rate for one-year constant maturity treasury bills as of August 8, 2012, is appropriate in this case.[10]  Further, Superior is entitled to all taxable costs of court.

The parties shall submit a Judgment to the Court in accordance with the above findings and conclusions within seven (7) days, consented to as to form by both parties.

August 14, 2012, Lafayette, Louisiana.

C. Michael Hill
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

---

[10]The Court is aware that Treasury bills are considered risk free and the Court is reluctant to award interest based on risk free rates.  However, in this case a bond is in effect to insure payment.  Thus the Court concludes the risk free rate is appropriate in this case.

38